# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

VAUGHN HARPER and
KEVON SWEAT,

                           Plaintiffs,

            -against-

TOWN OF NEWBURGH and
TASO KARABALES,

                       Defendants.

**DECISION & ORDER**

18 Civ. 2647 (PED)

-------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.:**

Plaintiffs Vaughn Harper ("Harper") and Kevon Sweat ("Sweat") (collectively, "Plaintiffs") bring this action against Defendants Officer Taso Karabales ("Karabales") and the Town of Newburgh (collectively, "Defendants") seeking damages pursuant to 42 U.S.C. § 1983 for claims stemming from Karabales' vehicular stop and arrests of Plaintiffs. This case is before me for all purposes on consent of the parties pursuant to 28 U.S.C. § 636(c). Dkt. 25. Presently before this Court is Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure: Dkts. 36 (Defendants' motion), 36-3 (Defendants' memorandum of law), 39 (Plaintiffs' opposition), and 44 (Defendants' reply).

For the reasons that follow, Defendants' motion for summary judgment is **DENIED.** However, Plaintiffs' state and federal equal protection claims against the Town of Newburgh and Karabales, respectively, as well as the unlawful stop, unlawful search, unlawful arrest, and excessive force claims against the Town of Newburgh are **DISMISSED** as withdrawn.

## I.     BACKGROUND

The following facts—taken in the light most favorable to Plaintiffs—are gathered from the parties' statements pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York, from the pleadings, and from affidavits, affirmations, and exhibits submitted by the parties in support of their contentions.

## A. Factual Background

Plaintiffs Harper and Sweat are African-American men, friends, and business partners. Defendant Karabales has been a Police Officer in the Town of Newburgh since 2006. Prior to the incident at the center of this dispute, Plaintiffs and Karabales did not know one another and had no previous interactions of any kind.

On December 4, 2016, Karabales stopped and arrested Plaintiffs, Plaintiffs were charged with unlawful possession of marijuana, and Harper was charged with two traffic violations— disobeying a traffic device and failing to comply with a lawful order. Plaintiffs contend that Karabales unlawfully stopped them, unlawfully searched Sweat's vehicle, unlawfully arrested them without probable cause, subjected them to excessive force, unlawfully seized Sweat's car, and maliciously prosecuted Plaintiffs. Additionally, Plaintiffs claim that the Town of Newburgh is liable for the unlawful impoundment of the vehicle and the malicious prosecution claim.

### 1. Facts Leading Up to the Search and Arrest

Harper testified that, on December 4, 2016, he met up with Sweat at Harper's residence located at 12 Hibbing Way, a cul-de-sac, in the Town of Newburgh. Plaintiffs, with Harper driving Sweat's vehicle, drove to Orleans Road—another cul-de-sac located less than half a mile away within the same housing division. The purpose of their trip is disputed, but neither

Plaintiffs nor Defendants contend that it was for any criminal purpose.[1] Harper testified that they went to "hang out and talk" and that they were going to see a friend who lived on the block. Sweat testified that they drove to Orleans Road so that he could speak with his aunt, who lived on the street, concerning her podcast.

Sweat testified that Harper parked the car, and Sweat went inside his Aunt's house to speak with her. After Sweat returned to the car, Plaintiffs called a friend and spoke on the phone for a few minutes before beginning the drive back to Harper's home on Hibbing Way. Harper, on the other hand, testified that the friend they drove to see did not respond to their call, and after waiting approximately seven minutes, Plaintiffs decided to return to Harper's home.

Plaintiffs turned right off Orleans Road onto West Meadow Wind Lane; drove approximately half of a block and turned right onto Wesley Court; drove approximately one block and turned right onto Angelina Alley, "a short house-length street;" and then made an almost immediate right turn onto Hibbing Way. Dkts. 45 at 4; 40-1 at 4. Harper's home, 12 Hibbing Way, is the first house on the left after making this turn. *Id.* Harper's mother, Patricia Figaro, who also lives at 12 Hibbing Way, declared that there are no stop signs between Orleans Road and Hibbing Way, except for one at the intersection of Angelina Alley and Hibbing Way. Dkt. 41.

Officer Karabales testified that he "vaguely" remembered his encounter with Plaintiffs. After reviewing the incident report, Karabales recalled receiving a call from dispatch reporting a suspicious vehicle at Meadow Winds, the housing development. The dispatch call described the

---

[1] Defendants object to consideration by this Court of Harper's declaration stating that his recollection had been refreshed and that he recalled, consistent with Sweat's testimony, that Plaintiffs went to Orleans Road to speak with Sweat's aunt. Dkt. 42. Any variance between Harper's and Sweat's testimony on this point is not material to the Court's decision.

type and color of the "suspicious" vehicle and that it was on Orleans Road. Karabales further testified that while he believed he was driving on West Meadow Winds Lane when he first saw the suspicious vehicle, he did not remember where he was when he first saw the car. R. 36-10 at 27. He did, however, recall that it was moving and coming off a road, which he believed was Orleans Road, when he first saw it. *Id.* at 27-29. Karabales did not remember if the car was heading in his direction or whether he had to make a U-turn to pursue the vehicle. *Id.* at 27-28.

Karabales asserted that when he saw the suspicious vehicle pulling off this road, he turned on his lights and siren, and the vehicle failed to stop. *Id.* at 17. He did not recall how close he was to Hibbing Way before turning on his lights and siren. Karabales added that the vehicle was not exceeding the speed limit but failed to stop at all stop signs between Orleans Road and Hibbing Way. Karabales stated that he was right behind Plaintiffs' vehicle "the entire way" after he picked up their vehicle, including when they turned onto Hibbing Way. However, Karabales was not certain when "the entire way" began, though he believed it began at Orleans Road. *Id.* at 35. Karabales believed he pulled up and stopped behind Plaintiffs' parked vehicle due to his concern for officer safety.

Plaintiffs dispute Karabales' account. First, Plaintiffs both deny that Karabales was ever right behind them and claim that Karabales first came into view as his patrol car came racing down Angelina Alley toward Hibbing Way with its lights flashing but without the siren on. Harper testified that after he turned onto Hibbing Way, he made a U-turn and parked in front of his house against the curb. As Harper began to park, he first observed Karabales' vehicle. Plaintiffs contend that Karabales' patrol car raced onto Hibbing Way and came to a stop in front of Plaintiffs' car.

## 2. The Search and Arrest

Karabales testified that after he stopped his patrol car behind Plaintiffs' vehicle, he exited his car with his gun drawn. According to Karabales, this was for officer safety and due to Plaintiffs' failure to stop. The parties disagree as to where Karabales' gun was pointed. Plaintiffs testified that the gun was pointed directly at them—specifically, at their heads—while Plaintiffs were seated in the car. Karabales testified that the gun was pointed at the driver's side of the vehicle. Town of Newburgh Police Officer Mark Ellingson testified that the proper protocol, assuming Plaintiffs' failed to stop and comply with Karabales, would be to unholster the gun and carry it in a "low ready" position, meaning pointed at a downward angle in order to maintain a good field of vision in front of the officer. However, if Plaintiffs had not failed to stop, then Karabales should have had his gun holstered absent some indicia of heightened dangers.

Harper testified that Karabales approached them with the gun pointed at their heads while yelling and cursing at Plaintiffs. Karabales denies this allegation. Harper also testified that he then rolled down the window and asked what was wrong, which Karabales also denies. Plaintiffs maintain that Karabales yelled for them to put their "fucking hands" on the "fucking dashboard" and "fucking wheel," and Plaintiffs complied. Karabales also denies this exchange. Harper continued that Karabales proceeded to yell and curse at them for failing to stop when Harper attempted to explain that he had not seen Karabales and that he lived at the house in front of which he was parked. According to Harper, Karabales responded, "I don't give a fuck!" Karabales denies saying this. With the gun allegedly still pointed at Plaintiffs through the driver's side window, Karabales yelled for Harper's driver's license. As Harper reached for his license, Karabales yelled at him, demanded he not move, reached into the car, and grabbed Harper by the hood of his sweatshirt. Harper attempted to explain that his seatbelt was still on

and asked for time to remove it when Karabales pulled him out of the car and slammed him against the side of the car. Karabales denies these allegations. The parties dispute whether Karabales' weapon was still unholstered when Harper exited the car.

Karabales then pat searched Harper and examined his license. Harper testified that he informed Karabales that he lived in the housing development and had for the last 15 years. Around this time, Harper's mother, Patricia Figaro, came out of her house on 12 Hibbing Way and exchanged words with Karabales before Harper was placed in handcuffs. Ms. Figaro declared that she identified herself as Harper's mother and as a former NYPD officer, to which Karabales replied that he "didn't give a fuck." Karabales denies saying this. At his deposition, Karabales had no recollection of anything he said to Plaintiffs or anything they said to him. Additionally, he had no recollection of whether Harper complied with "whatever order [he] gave [Harper] after [Harper] w[as] out of [his] vehicle," but he added that Harper "got out of the vehicle when [he] asked him." Dkt. 36-10 at 48. Karabales also did not recall whether there was any physical contact with Harper when he exited the vehicle. As alleged by Harper, Karabales then tightly handcuffed Harper and placed him in Karabales' patrol car. Karabales testified that his basis for placing Plaintiffs in custody was for "[f]ailing to comply. It was for my safety, not knowing why they did not stop for me initially." Dkt. 36-10 at 48.

Officer Ellingson arrived on the scene at some point after Karabales and spoke briefly with Sweat after Harper had been handcuffed and placed in Karabales' patrol car. Sweat testified that Karabales then pulled him out of the car and cuffed him. Defendants insist that Sweat was asked to step out of the car, not pulled. Karabales then searched the car allegedly finding marijuana. Karabales testified that he searched the car due to an odor of marijuana coming from the car and because a green, leafy substance, which later tested positive for

marijuana, was in plain view. Plaintiffs characterize Karabales' testimony as providing two different versions of the story, and that only in the second version did Karabales add that he saw marijuana in plain view. At his deposition, Karabales was initially asked what happened after he put Plaintiffs in the patrol vehicles, and he answered, "There was an odor of marijuana in the car. In the center console there was a green, leafy substance that later field tested positive for marijuana." Dkt. 36-10 at 18. Later in his deposition, Karabales testified as follows:

> Q Was there anything in view inside the car that led you to search the car?
>
> A There was the smell of marijuana.
>
> Q I understand that that was your testimony. This is a little bit of a different question. Was there anything in view that you could see that led you to -- not smell, but that you could see that led you to search the car?
>
> A There was a green leafy substance in the center console.
>
> Q Was the console open?
>
> A I don't remember if it was in the console or in the cup holder. It was right there in plain view.
>
> Q You're saying it was in plain view?
>
> A Yes.
>
> Q Plain view, do you understand that would give you legal basis to search the car?
>
> A Yes.

Dkt. 36-10 at 53.

Plaintiff Sweat denies that marijuana was in the car. Ms. Figaro claimed that she watched Karabales search the car but did not see him recover anything, including marijuana. She declared that only after repeatedly asking Karabales why he had arrested Plaintiffs did Karabales finally show her a baggie with what looked like marijuana inside. Ms. Figaro did not

7

see him find this baggie and did not know where it came from. Officer Ellingson was present

during the vehicle search and did not remember seeing marijuana. Harper testified as follows:

Q. Prior to the stop by Officer Karabales, did you and Mr. Sweat, just you or just Mr. Sweat, consume, smoke, use in any way, marijuana while in Mr. Sweat's car?

A. No.

Q. Now you said while Officer Karabales was searching your car -- sorry -- Mr. Sweat's car?

A. Yes.

Q. You overheard your mother ask what you were being arrested for?

A. Yes.

Q. And at that point, had Officer Karabales told you you were under arrest?

A. No.

Q. How did Officer Karabales or did Officer Karabales respond to your mother?

A. As he was searching the vehicle, he found a bag of marijuana and tells my mother: This is what they are being arrested for.

Q. So that actually goes into my next question. So inside Mr. Sweat's vehicle you are aware that the police found, you said it was one bag?

A. Yes.

Q. And I apologize. I thought it was two.

A. I could have been two. I'm just recollecting.

Q. It was not a large . . .

A. Not at all.

Q. I would say two for now, but one or two zip lock bags containing what was described as a green leafy substance that was later described as marijuana?

A. Yes.

Q. And do you know where the baggies came from?

A. No.

Q. Did they belong to you?

A. No.

Q. So you did not purchase them?

A. No.

Q. And were they -- they were not given to you?

A. No.

Q. And do you know -- do you know – if they belonged to Mr. Sweat?

A. No.

Q. No, you do not know or no, they did not?

A. No, I don't know if they did or not.

Q. Do you know where the two bags were located within the car?

A. They was in the middle console by the arm. Not the glove compartment. The glove compartment is right here. So right there.

Q. So I have a middle console in my car. There are a couple of parts. I have a cup holder portion and the portion I have to lift up?

A. The portion that you have to lift up. It was found in there.

Dkt. 36-8 at 39-41.[2]

---

[2] Plaintiff's counsel states that Harper simply admitted that "Karabales claimed to have found a baggie with marijuana in the car's console[,]" Dkt. 43, paragraph 16, an interpretation which does not flow naturally from the testimony set forth above. The Court hereinafter concludes that the testimony regarding marijuana in the car is in conflict, precluding summary judgement. Mr. Harper is of course free to explain or elaborate on this testimony at trial. On the present record, however, it is hard to imagine how Harper could prevail on some of his claims.

After Plaintiffs were cuffed and placed in the patrol cars, they were transported to the police station, processed, and charged. The parties dispute how long the Plaintiffs were kept at the police station before they were released. Harper testified that he remained cuffed to the bench for approximately 3.5 hours and was released the same day. Dkt. 36-8 at 47. Sweat testified that he was kept at the police station for approximately 1.5 hours. Dkt. 36-9 at 41. Karabales estimated that Plaintiffs remained in the station for two to three hours. Dkt. 36-10 at 61.

Officer Karabales ordered Sweat's car impounded because, according to his testimony, the driver was arrested, and the vehicle registration did not correspond to the home in front of which the car was parked. Plaintiffs insist that Sweat's car was safely and legally parked in front of 12 Hibbing Way, where Harper resided. Defendants admit only that the vehicle was parked at this address.

### 3. Dispatch & Incident Reports

The dispatch report stated in full: "vehicle left the area officer trying to catch up to the vehicle stopped i/f/o [in front of] 12 Hibbing Way." Dkt. 36-12. As noted by Plaintiffs, the dispatch report does not reflect that Plaintiffs failed to stop.

Officer Karabales' narrative in his incident report stated in full:

On the above date and time PO Ellingson and myself were dispatched to a suspicious Black Honda parked at the end of Orleans RD occupied by 2 males. As I tunred [sic] onto Orleans Rd I noticed that car parked, as I got closer the vehicle

Dkt. 40-1 at 2. Karabales testified that he wrote a full incident report and turned it in. He added that additional information would have been in the narrative section, including that the vehicle failed to stop, he smelled the odor of marijuana, and the streets on which he travelled in pursuit of Plaintiffs. Despite discovery requests by Plaintiffs, no additional report or metadata related to

10

the report was produced. As Plaintiffs note, the incident report contained no description of the pursuit, the basis for the arrest, the vehicle search, or the basis for the vehicle search. Both officers testified that the purpose of an incident report is to provide such details. The allegedly incomplete incident report was signed by a supervising sergeant.

### 4. Post-Arrest

Plaintiffs appeared in court approximately five or six times before all the charges were dismissed in Plaintiffs' favor. The charges were dismissed because Karabales did not appear due to being out on disability leave. Sweat failed to appear at one court date and had a warrant issued for his arrest.

Harper did not lose his job and did not miss time from work. Harper claims that he had "[p]ain in [his] wrist for a little bit" as a result of being tightly handcuffed. Sweat was not terminated from his job, his employer did not take action against him, and he sustained no physical injuries. Plaintiffs did not seek any medical treatment or psychological counseling following the incident.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the

outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323-24). To defeat a motion for summary judgment, the nonmovant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . .

. the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252).

## III.  DISCUSSION

### A.  Plaintiffs Do Not Oppose Dismissal of Certain Claims

Defendants seek summary judgment on Plaintiffs' claims of unlawful stop, unlawful search, unlawful arrest, excessive force, unlawful seizure of Sweat's vehicle, malicious prosecution, and equal protection claims alleging that the foregoing actions were taken, at least in part, because of Plaintiffs' race.  Additionally, Defendants claim that Karabales is entitled to qualified immunity on all claims.

In Plaintiffs' Memorandum of Law in response to the instant motion, Dkt. 39, Plaintiffs withdraw their section 1983 claims against the Town of Newburgh, "except for Sweat's claim for unlawful seizure (impoundment) of his car;" their state law equal protection claim against the Town of Newburgh; and their federal equal protection claim against Karabales.  The following claims against Karabales remain in dispute: (1) unlawful stop, (2) unlawful search, (3) unlawful arrest, (4) excessive force, (5) unlawful vehicle seizure, and (6) malicious prosecution.  And, as against the Town of Newburgh, the following claims remain in dispute: (7) state law claim for malicious prosecution and (8) a claim pursuant to *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978) concerning the impoundment of Sweat's vehicle.

Accordingly, Plaintiffs' state and federal equal protection claims against the Town of Newburgh and Karabales, respectively, as well as the unlawful stop, unlawful search, unlawful arrest, and excessive force claims against the Town of Newburgh, are dismissed.

### B.  Unlawful Stop Against Karabales

13

## 1. Reasonable Suspicion

"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014). "The Fourth Amendment permits brief investigative stops–such as the traffic stop in this case–when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks and citation omitted). In other words, "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir.2009).

"The objective reasonableness of an officer's suspicion preceding any given traffic stop depends on the totality of the circumstances leading to that stop and on the traffic law at issue." *United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015). "This objective inquiry disregards the officer's subjective motivation and asks instead whether a reasonable officer would suspect unlawful activity under the totality of the circumstances." *Id.* Ultimately, "the determinative question is not whether the defendant actually violated the traffic law . . . but whether an objectively reasonable police officer could have formed a reasonable suspicion that the defendant was committing a violation." *Id.* at 240 (quoting *Stewart*, 551 F.3d at 191).

"Traffic stops are presumptively reasonable under the Fourth Amendment if the officer has probable cause to believe that a traffic infraction has occurred." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). "When an officer observes a traffic offense–however minor–he has probable cause to stop the driver of the vehicle." *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (quotation marks and citation omitted).

Here, Defendants assert that after Officer Karabales—whose memory of the incident is admittedly vague—received a radio dispatch reporting a "suspicious vehicle," he saw a vehicle matching the description given, and he turned on his lights and siren in an attempt to stop the vehicle. Plaintiffs then allegedly failed to stop. Moreover, Defendants allege that Plaintiffs failed to stop at all stop signs along the route driven while Karabales followed them. Defendants argue that Plaintiffs' evasive behavior and failure to obey traffic laws provided Karabales with the reasonable suspicion required to initiate the traffic stop.

Plaintiffs contend that this dispatch call for a "suspicious vehicle," without any further detail regarding what made it suspicious, did not give rise to a "particularized and objective basis for suspecting" plaintiffs of "criminal activity" in the first place. Dkt. 39 at 14 (quoting *Navarette*, 572 U.S. at 396). Plaintiffs further maintain that they did not see Karabales until after they had begun to park in front of Harper's home, and consequently deny having fled or engaged in evasive driving. Plaintiffs also deny that there are stop signs on the route from Orleans Road to Hibbing Way, apart from at the very last intersection leading to Hibbing Way. Defendants respond that even if Karabales did not reach Plaintiffs until they were on Hibbing Way, Plaintiffs failure to stop at the last stop sign was enough to justify the stop. But Plaintiffs deny that they failed to stop at any stop sign.

"Anonymous tips, without further corroboration by the police to demonstrate that the tip has sufficient indicia of reliability, are insufficient to provide the reasonable suspicion necessary for a valid *Terry* stop." *United States v. Freeman*, 735 F.3d 92, 97 (2d Cir. 2013) (citing *Alabama v. White*, 496 U.S. 325, 329–32 (1990)). Accordingly, the "suspicious vehicle" tip – standing alone – cannot serve as justification for the stop. Whether the stop was justified

because Plaintiffs failed to stop for Karabales, or committed traffic infractions, turns on disputed questions of fact which the jury must decide.

Accordingly, considering the facts in the light most favorable to Plaintiff, genuine issues of material fact preclude summary judgment on this claim.

## 2. Qualified Immunity

Defendants also seek summary judgment of Plaintiffs' unlawful stop claim on the ground of qualified immunity. "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013). "Said differently, if the officer's conduct violated a right, we analyze the objective reasonableness of the officer's belief in the lawfulness of his actions. If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken." *Loria v. Gorman*, 306 F.3d 1271, 1282 (2d Cir. 2002). Therefore, "even if a right is clearly established in certain respects, qualified immunity will still shield an officer from liability if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Zalaski*, 723 F.3d at 389 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In sum, when confronted with a qualified immunity defense, a court assesses: "(1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

As Defendants concede that being stopped by police absent reasonable suspicion would violate a clearly established constitutional right, I turn to the third element. Construing the evidence in the light most favorable to the Plaintiffs, and as discussed *supra*, there is no uncontested evidence in the record establishing reasonable suspicion that Plaintiffs engaged in any criminal activity, including failing to stop for Karabales or failing to stop at stop signs. Thus, disputes as to the facts preclude qualified immunity on this claim.

### C. Unlawful Search Against Karabales

The "automobile exception" to the Fourth Amendment "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010) (citing *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*per curiam*)). "Consistent with the automobile exception, it is well settled that the odor of marijuana provides probable cause to search the entirety of a vehicle, including its contents." *Hardy v. Baird*, No. 13 Civ. 7402, 2016 WL 2745852, at *7 (S.D.N.Y. May 10, 2016) (collecting cases). "Additionally, if '[f]rom their position outside the defendant's vehicle, and prior to conducting any search, the police observe[ ] a bag containing a substance that appear[s] to be marijuana inside the [vehicle], . . . the police ha[ve] probable cause' to search the 'defendant's entire [vehicle].'" *Ulerio v. City of New York*, No. 18 Civ. 2155 (GBD), 2018 WL 7082155, at *5 (S.D.N.Y. Dec. 20, 2018) (quoting *United States v. Cuevas*, No. 15 Crim. 846 (PKC), 2016 WL 2766657, at *3 (S.D.N.Y. May 12, 2016)).

Here, Defendants argue that Karabales smelled a strong odor of marijuana coming from the car and saw, in plain view, a green, leafy substance that later tested positive for marijuana. But Plaintiff Sweat maintains that Karabales could not have smelled or seen marijuana in the car because there was no marijuana in the car. Plaintiffs also note that Officer Ellingson testified

that he did not recall seeing any marijuana on the scene, and Harper's mother, Ms. Figaro, attested that she watched Karabales search the car but did not see him find marijuana. Although Defendants point to Harper's testimony, discussed *supra*, indicating that marijuana was found inside the console of vehicle, that testimony is in conflict with Sweat's testimony. Thus, the facts remain in dispute, and weighing the credibility of these witnesses is the province of the jury.

Accordingly, Plaintiffs have alleged facts sufficient to support an inference that the search was unlawful, and Defendants' motion for summary judgment on this claim is denied.

### 1. Qualified Immunity

Construing the evidence in the light most favorable to Plaintiffs, and for the reasons discussed above, a reasonable jury could credit Sweat's testimony and conclude that Karabales' search of Sweat's vehicle violated Plaintiffs' clearly-established Fourth Amendment rights. Accordingly, I conclude that Officer Karabales is not entitled to summary judgement as to qualified immunity on this claim.

### D. Unlawful Arrest Against Karabales

A Section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York state law. *See, e.g., Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Under New York law, a plaintiff seeking to establish a cause of action for false arrest or unlawful detention must show that: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged, such as by probable cause or a warrant. *Willey v. Kirkpatrick*, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting *Broughton v. State of New York*, 335 N.E.2d 310, 314 (N.Y. 1975)). "To

avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he

had probable cause for the arrest, or (2) he is protected from liability because he has qualified

immunity." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

### 1. Probable Cause

"Because one element of a false arrest claim under New York law is that the confinement

was not otherwise privileged, the existence of probable cause for the arrest is a complete defense

to an action for false arrest." *Morris v. Silvestre*, 604 F. App'x 22, 24 (2d Cir. 2015) (internal

quotation marks and citations omitted). "An officer has probable cause to arrest when he or she

has 'knowledge or reasonably trustworthy information of facts and circumstances that are

sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has

committed . . . a crime.'" *Burgess v. DeJoseph*, 725 Fed. Appx. 36, 39 (2d Cir. 2018) (citing

*Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)). "The inquiry is limited to whether the facts

known by the arresting officer at the time of the arrest objectively provided probable cause to

arrest." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation

marks and citation omitted). Moreover, "it is not relevant whether probable cause existed with

respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer

at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the

validity of the *arrest*, and not on the validity of each charge." *Jaegly*, 439 F.3d at 154. "[U]nder

both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is

appropriate if the undisputed facts indicate that the arresting officer's probable cause

determination was objectively reasonable." *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir.

2007).

Here, citing *Townes v. City of New York*, 176 F.3d 138, 144-49 (2nd Cir. 1999), Defendants argue that even if the search of Plaintiffs' car was illegal, the marijuana allegedly obtained in the search established probable cause for the arrests of Plaintiffs as the fruit of the poisonous tree doctrine is inapplicable to section 1983 actions. Once again, however, Karabales' discovery of marijuana in the car is controverted by Plaintiff Sweat's testimony, so the Court cannot grant summary judgment on the basis of marijuana-related probable cause.

Separate and apart from issues relating to the recovery *vel non* of marijuana, Plaintiffs also stress that this Court "must consider [only] those facts available to the officer at the time of the arrest and immediately before it." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2010). To address this issue, the Court must first answer the question of when the arrest occurred.

Plaintiffs argue that, assuming the jury credited Karabales' discovery of marijuana in the car, Karabales effected the arrest when he handcuffed and took Plaintiffs into custody and, at that point, the facts are disputed as to whether Harper had committed any traffic violations and undisputed as to Sweat as he was not driving. It is undisputed that Karabales ordered Harper to exit his vehicle, conducted a pat-frisk search, handcuffed Harper, and placed Harper in the back of his police vehicle before allegedly seeing a green, leafy substance in plain view and noticing a strong odor of marijuana coming from the vehicle—facts which are, of course, disputed.

Defendants, on the other hand, argue that New York has long rejected the notion "that the application of handcuffs will always be dispositive of whether the detention of a suspect on reasonable suspicion has been elevated to a full-blown arrest," *People v. McCarthy*, 64 Misc.3d 20, 23-24 (Sup. Ct. App. Term 2019), and that "police officers are entitled to handcuff defendants to effect their nonarrest detention in order to ensure their own safety," Dkt. 44 at 8 (citing *People v. Allen*, 73 N.Y.2d 378, 379 (1989)). Defendants continue that given that

20

Karabales did not know Plaintiffs, and they refused to stop at his command, it was "completely reasonable" to remove Plaintiffs from the car for his safety during the traffic stop. *Id.* Defendants appear to contend that the arrest occurred after Karabales discovered the marijuana, which provided him with the requisite probable cause to make the arrest.

In anticipation of this argument, Plaintiffs argue that "under both federal and New York law, a plaintiff need not have been formally arrested to claim false arrest." *Calderon v. City of New York*, 138 F. Supp. 3d 593, 610 (S.D.N.Y. 2015) (citing *Jaegly*, 439 F.3d at 151). Indeed, "[a]n arrest need not be formal," and "whether an officer has . . . effected an arrest depends on the facts surrounding their encounter, and must be assessed in light of those facts. An arrest need not be characterized by the same level of intrusiveness in every circumstance." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991). "More specifically, the Circuit looks to the 'amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.'" *Farrell v. City of New York*, No. 15 Civ. 8401 (PAE), 2018 WL 944400, at *7 (S.D.N.Y. Feb. 15, 2018) (quoting *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004)). "If to a reasonable observer, [Karabales], upon physical contact with [Plaintiffs], acted with an unreasonable level of intrusion given the totality of the circumstances in restraining [Plaintiffs'] freedom of movement to the point where [they] did not feel free to leave, than [sic] an arrest could be found." *Posr*, 944 F.2d at 99. However, "[t]he issue of precisely when an arrest takes place is a question of fact." *Id.*

Here, Plaintiffs have presented evidence from which the jury could find that Karabales arrested Plaintiffs without probable cause and prior to finding marijuana in the vehicle.

According to Plaintiffs, at their initial encounter, Karabales drew his gun and pointed it at Plaintiffs while cursing and yelling contradictory commands. Karabales then pulled Harper from the vehicle, slammed him against the car, handcuffed him, and placed him in a patrol car. Karabales then pulled Sweat from the vehicle, handcuffed him, and placed him in a patrol car. Subsequently, Karabales alleges that he discovered the marijuana. "This [is] sufficient for a jury to find that [Karabales] had "seized" [Plaintiffs], in that [Plaintiffs] did not feel free to leave, in a manner that was unreasonably intrusive under the circumstances," *see id.*, and that he did so without probable cause.

Considering the facts in the light most favorable to Plaintiff, the Court finds that on this record genuine issues of material fact exist that preclude summary judgment.

### 2. Qualified Immunity

In the alternative, Defendants argue that Plaintiffs' false arrest claim should be dismissed because Defendants are entitled to qualified immunity.

In the context of a false arrest claim, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks and citation omitted). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, . . . if there is such a dispute, the factual questions must

be resolved by the factfinder." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (internal citations omitted).

Again, the factual disputes as to whether Plaintiffs saw Karabales patrol vehicle behind them, whether they failed to stop for officer Karabales or for any stop signs, and whether there was any marijuana found in the car, preclude this Court from determining whether even arguable probable cause existed to make the arrests. These are factual questions that must be resolved by the factfinder. Accordingly, summary judgment is unwarranted.

### E. Excessive Force against Karabales

Defendants argue that the force Karabales admits to using against Plaintiffs—that Karabales brandished his weapon, removed Harper from the car after his gun was re-holstered, patted him down, and secured him in handcuffs—is insufficient to allege an excessive force claim. Defendants argue that Karabales' testimony that he had no idea who or what was in the vehicle, or why the vehicle refused to stop on his command, supported Karabales' decision to brandish his weapon due to the potential danger involved in the stop. Additionally, Defendants assert that Plaintiffs alleged no physical injuries and did not seek medical or psychological treatment.

Plaintiffs paint a different picture. Plaintiffs contend that Karabales was never right behind their vehicle, had no objective basis to believe they were fleeing, and had no lawful basis to stop them in the first place. Plaintiffs next allege that Karabales approached them cursing and shouting contradictory orders with his gun pointed at their heads. Officer Ellingson testified that such conduct, were it to happen, would violate protocol. Plaintiffs further allege that the gun was still unholstered and pointed at Harper when Karabales yanked him out and slammed him against the car. Additionally, Plaintiffs contest Defendants' assertion that Plaintiffs were not

injured and allege that Karabales excessively tightened the handcuffs on Harper, causing him pain.

A police officer's use of force is excessive, thereby violating the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Courts must evaluate the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This inquiry considers a number of factors, "including 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251-52 (2d Cir. 2001). Courts consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000).

Drawing all inference in favor of Plaintiffs and assuming that Plaintiffs were not fleeing from Karabales and did not run any stop signs, the question is whether Karabales' alleged actions of unholstering his gun, pointing it at Plaintiffs' heads, cursing and yelling contradictory instructions, pulling Harper from the car with his gun still drawn, slamming Harper against the car, excessively tightening Harper's handcuffs, and pulling Sweat out of the car amount to a violation of Plaintiffs' Fourth Amendment rights.

"The vast majority of cases within the Second Circuit hold that merely drawing weapons when effectuating an arrest does not constitute excessive force as a matter of law." *Podlach v. Vill. of Southampton*, No. 14 Civ. 6954 (SJF) (SIL), 2017 WL 4350433, at *3 (E.D.N.Y. May 11, 2017), *report and recommendation adopted*, No. 14 Civ. 6954 (SJF) (SIL), 2017 WL 4350434 (E.D.N.Y. June 6, 2017), *aff'd*, 767 F. App'x 200 (2d Cir. 2019) (collecting cases). Additionally, "Courts within the Second Circuit have been reluctant to entertain excessive-force claims without any physical contact. Mere threats or verbal harassment, without any 'appreciable injury,' generally are not actionable under section 1983." *Merrill v. Schell*, 279 F. Supp. 3d 438, 442–44 (W.D.N.Y. 2017) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)). On the other hand, "it is possible that verbal threats, combined with the brandishing of the weapon, could be unreasonable and therefore constitute excessive force." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 296 (S.D.N.Y. 2015). In other words, considering the totality of the circumstances, verbal threats or harassment combined with the brandishing of a weapon, even without any appreciable injury, can constitute excessive force.

Crediting the Plaintiffs' account of the pursuit and arrest for the purposes of summary judgment, there was no need for the application of force by Karabales. Karabales responded to a dispatch call reporting a "suspicious" vehicle but indicating no criminal activity. A reasonable jury could conclude that Karabales stopped Plaintiffs for this reason alone, that Karabales was not directly behind Plaintiffs, Plaintiffs were not attempting to flee, they did not fail to stop at the single stop sign along the route to Hibbing Way, and that there was no immediate threat to Karabales or to others. The sole remaining question, considering the totality of the circumstances, is whether Karabales' actions described above amount to actionable excessive force.

As in the instant case, in *Podlach*, 2017 WL 4350433, at *3, the excessive force claim was "premised primarily upon an unknown male officer drawing his weapon and pointing it at [the plaintiff] during her arrest while she was inside of her car, approximately ten-feet away, and unarmed." However, unlike this case, the Court there noted that the allegations failed to allege that law enforcement used any actual physical force, and the plaintiff admitted that she had repeatedly refused to comply with police directives to stop or get out of her vehicle. *Id.* at 4. Based on these facts, the Court determined that the use of and/or threat of force under these circumstances was reasonable. *Id.* Additionally, the Court concluded that the plaintiff's allegations of emotional distress and exacerbation of other medical ailments did not save her claim "because there [was] no actual excessive force alleged as a matter of law." *Id.* at 5. Finally, the Court concluded that although the plaintiff "was not convicted of a crime, her plea to disorderly conduct nevertheless acknowledges that '[s]he was engaged in some unlawful activity for which the police could properly take [her] into custody.'" *Id.* at 6 (quoting *Sealey v. Fishkin*, 96 Civ. 6303, 1998 WL 1021470, at *4 (E.D.N.Y. Dec. 2, 1998)).

Here, Plaintiffs allege not only that Karabales drew his weapon and pointed it at Plaintiffs while they were sitting unarmed in their car, but also that the gun was pointed at their heads, Karabales cursed and yelled contradictory commands, and, with his gun still pointed at Harper, forcibly pulled him from the vehicle by the hood of his sweatshirt and slammed him against the car. Additionally, Harper alleges that he was tightly handcuffed.

As noted above, in *Green v. City of Mount Vernon*, the Court stated that "it is possible that verbal threats, combined with the brandishing of the weapon, could be unreasonable and therefore constitute excessive force." 96 F. Supp. 3d at 296. *Green* involved officers, with a valid warrant, forcibly entering the plaintiff's home with guns drawn and pointed at the plaintiffs

26

and threatening bodily harm if they failed to comply with orders. *Id.* at 295. In *Green*, the Court concluded that the plaintiff's conclusory assertion that the officers "threatened each Plaintiff with immediate harm" was insufficient to support plaintiff's theory. *Id.* at 297.

Here, there was no warrant and, accepting Plaintiffs' version of events, no reasonable suspicion or probable cause to stop and arrest Plaintiffs, and Plaintiffs have alleged actual, as opposed to the mere threat of, physical force. Additionally, these allegations are combined with Karabales brandishing his weapon and cursing and yelling contradictory commands.

Plaintiffs concede that the alleged excessively tight handcuffing alone is not sufficient to state a claim for excessive force but argue that it should be a factor to consider in deciding whether Karabales used excessive force. Dkt. 39 at 21 n.4. As discussed *supra*, the extent of the injury is a factor to be considered in excessive force actions, and Harper's handcuffing and the resulting *de minimis* injury have been considered.

*Lilakos v. New York City*, No. 14 Civ. 05288 (PKC) (LB), 2016 WL 5928674 (E.D.N.Y. Sept. 30, 2016) also involved an officer drawing his gun, cursing and yelling directives, and threatening physical harm. The plaintiff alleged that, with guns aimed at him, "the police screamed at him to not '[expletive] move,' 'turn the [expletive] around,' and 'get on your [expletive] knees.' [The plaintiff] further allege[d] that '[w]hen he told them he had a cramp in his leg . . . one cop threatened to hurt [him] with his gun if he didn't stay on his knees.'" *Id.* at 6. The Court held that these allegations were sufficient to survive a motion to dismiss the plaintiff's excessive force cause of action. *Id.*

Here, while Plaintiffs have not alleged that they were verbally threatened with bodily harm, by gun or otherwise, they do allege that they were verbally harassed; a gun was pointed at their heads at close range; that Harper was physically removed from and slammed against the car

27

while the gun was still pointed at him; Harper was tightly handcuffed, which resulted in "[p]ain in [Harper's] wrist for a little bit;" and Sweat was "pulled" from the car. I find that these allegations, if credited by the jury, would support a finding of excessive force in violation of Plaintiffs' Fourth Amendment rights.

Crediting Plaintiffs' version of events, Plaintiffs have identified questions of material fact about whether the amount of force that Defendant used during the course of Plaintiff's stop and arrest was reasonably sufficient to defeat summary judgment. Accordingly, summary judgment is not warranted.

### 1. Qualified Immunity

Alternatively, Defendants argue that Karabales is entitled to summary judgment on Plaintiffs' excessive force claim because he is entitled to qualified immunity. In the context of excessive force claims, "the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances." *Green*, 96 F. Supp. 3d at 295 (quoting *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F.Supp.2d 575, 594 (S.D.N.Y. 2013)).

The Court cannot conclude that Karabales is protected by qualified immunity because disputed issues of fact prevent the Court from evaluating whether the Karabales' actions were objectively reasonable. Therefore, Defendants' motion for summary judgment on Plaintiffs' excessive force claim is denied.

### F. Unlawful Seizure of Sweat's Vehicle

### 1. Unlawful Seizure Against Karabales

Defendants claim that Karabales impounded Plaintiff Sweat's vehicle because the vehicle registration "did not come back to the location where the vehicle was parked." Dkt. 36-3 at 14.

Defendants further claim that Karabales impounded the vehicle pursuant to the Town of Newburgh's written policy, which sets forth the procedures for impounding "vehicles which are illegally parked, stolen, abandoned or involved in criminal activity." Dkt. 36-15 at 3. Defendants conclude that because Plaintiffs were arrested and charged with unlawful possession of marijuana and Sweat's car was not parked in front of his residence, Karabales properly impounded the vehicle.

Plaintiff Sweat contests whether marijuana was ever found in the vehicle and, additionally, argues that even assuming a jury concluded there was marijuana found in the car, there is no evidence that the vehicle was somehow being used as an instrumentality of crime. Moreover, Sweat maintains that his car was lawfully and safely parked in front of Harper's home.

An impoundment must either be supported by probable cause or be consistent with law enforcement's "community caretaking functions" in the interests of public safety. *See S. Dakota v. Opperman*, 428 U.S. 364, 368, 370 n.5 (1976); *see also United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) ("An impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation.").

Defendants argue that they had probable cause to impound the vehicle due to both Plaintiffs' failure to stop when he turned on his lights and siren and the presence of marijuana. As discussed, genuine disputes as to these material facts exist and summary judgment is unwarranted.

Sweat argues that even in the absence of probable cause, Defendants likewise do not fall within the "community caretaking function" exception. Police have the power to impound

vehicles where it is "[i]n the interests of public safety and as a part of what the Court has called 'community caretaking functions.'" *Opperman,* 428 U.S. at 368. Police officers may exercise their discretion in deciding whether to impound a vehicle "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine,* 479 U.S. 367, 375 (1987). "[W]hether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case." *United States v. Lyle*, 919 F.3d 716, 731 (2d Cir. 2019) (quoting *U.S. v. Coccia*, 446 F.3d 233, 239 (1st Cir. 2006)).

The only undisputed facts related to this claim are that Sweat's car was parked in front of the home of Harper, and of his mother, on Hibbing Way, a cul-de-sac in a housing development, and Harper's mother was present during the stop and arrest. Defendants emphasize the portion of the Town policy setting forth the procedures for impounding vehicles "involved in criminal activity" and argue that Karabales complied with this policy. However, Sweat's vehicle's involvement in criminal activity is disputed. Thus, Defendants' sole remaining argument for the purposes of this motion is that the vehicle registration did not match the address where it was parked, and, presumably, the impoundment was in the interest of public safety. Defendants correctly note that all of the cases cited by Plaintiffs in support of their "community caretaking" argument involve vehicles parked on the owner's property while, here, it is undisputed that Sweat's vehicle was not parked on his property, *see United States v. Squires*, 456 F.2d 967, 970 (2d Cir. 1972); *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005); *United States v. Jacobs*, 2000 WL 1701723, at *3 (Dist. Kan. 2000), but this does not end the inquiry.

Where the arrestee is the sole occupant of the vehicle, or all occupants are arrested—and no third-party is immediately available to entrust with the vehicle's safekeeping—and where left

on the street the vehicle could impede traffic or threaten public safety and convenience, impoundment is appropriate under the community caretaking function. *See Lyle*, 919 F.3d at 731–32; *Barnes*, 2015 WL 4076007, at *8–9. In *Lyle*, the Second Circuit held that the impoundment was reasonable under the Fourth Amendment because the arrestee was the sole occupant of a rental car, there was no third-party immediately available to entrust with the vehicle's safekeeping, the driver had a suspended license so even if quickly released he would not have been able to drive, and if "left on a public street in a busy midtown Manhattan location . . . it could have become a nuisance or been stolen or damaged and could have become illegally parked the next day." 919 F.3d at 731.

Here, it is undisputed that the vehicle was parked in front of Harper's home, and his mother, who also lived at the home in front of which the car was parked, was present. Additionally, the vehicle was parked on a suburban cul-de-sac, in a housing development, and not in a high traffic area such as midtown Manhattan.

In *Barnes*, the Court found that material disputes of fact existed precluding the Court from determining that the warrantless seizure of the vehicle was reasonable as a matter of law. 2015 WL 4076007, at *9. In *Barnes*, there was evidence that the arrestee was available and willing to arrange for the removal of the car before officers towed it, and the "[d]efendants d[id] not assert, nor [wa]s there any indication in the record, that the car was parked in a spot where it was not legally permitted to be, that it was impeding traffic, or that it was threatening public safety in any way." *Id.* Moreover, the defendant's argument that the impoundment was reasonable because the arrestee admitted that he knew the vehicle was suspected in the commission of a murder "[wa]s unavailing in the communitycaretaking [sic] context where

impoundment must be justified 'on the basis of something other than suspicion of evidence of criminal activity.'" *Id.* (quoting *Bertine,* 479 U.S. at 375).

Similarly, here, Defendants have not asserted, nor is there any indication in the record, that the car was parked illegally, that it was impeding traffic, or threatening public safety in any way. Accordingly, as a matter of law, the impoundment of Sweat's vehicle cannot be justified pursuant to the community caretaking doctrine. However, material disputes of fact exist as to whether Karabales had probable cause to impound the vehicle due to its involvement in criminal activity making judgement as a matter of law inappropriate at this time.

### a. Qualified Immunity

Defendants contend that Karabales is entitled to qualified immunity on all claims but make no specific arguments regarding this cause of action. Again, the Court cannot conclude that Karabales is protected by qualified immunity because disputed issues of fact prevent the Court from evaluating whether Karabales' actions were objectively reasonable. Therefore, Defendants' motion for summary judgment on Plaintiffs' unlawful seizure of Sweat's vehicle against Karabales is denied.

### 2. *Monell* Claim against the Town of Newburgh

Defendants argue that Plaintiffs "have not presented any evidence, referenced any facts or otherwise provided any document or incident that supports [a *Monell* claim] against the Town of Newburgh." Dkt. 36-3 at 19. Plaintiffs, in their opposition, counter that Officer Ellingson's deposition testimony demonstrates the Town of Newburgh's "longstanding policy or custom of always impounding a vehicle whenever it allegedly failed to comply with an attempted police stop," which violates the Fourth Amendment "because it fails to take into account the particular circumstances of a given situation before seizing a vehicle without a warrant." Dkt. 39 at 22.

"To bring a claim against a municipality under § 1983, the plaintiff must allege that the challenged conduct was 'performed pursuant to a municipal policy or custom.'" *Aitabedellah Salem v. The City of New York, et al.*, No. 17 Civ. 4799 (JGK), 2019 WL 4242249, at *6 (S.D.N.Y. Sept. 5, 2019) (citing *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004); *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 669 (1978)). "To identify a 'policy or custom,' the plaintiff must demonstrate that the municipality, through its deliberate conduct, was the 'moving force' behind the injuries alleged." *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

> The plaintiff can satisfy the "policy or custom" requirement by alleging
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Id.* at 7 (quoting *Tieman v. City of Newburgh*, No. 13 Civ. 4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015)).

As discussed *supra*, police officers may impound an arrestee's vehicle on the basis of either probable cause or the officer's community caretaking function. While police officers may exercise their discretion in deciding whether to impound a vehicle "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity," *Bertine,* 479 U.S. at 375, their decision must still be made in the interests of public safety, *Opperman,* 428 U.S. at 368.

Here, Officer Ellingson testified that when a person fails to stop "when the police turn on their lights and/or sirens," the police department's routine procedure is to impound the vehicle for the purpose of "potentially further investigating what happened." Dkt. 36-11 at 43-45. Moreover, Ellingson testified that this is the procedure regardless of whether the car is parked in front of one of the occupants' residences. *Id.* at 45. Ellingson recalled being involved in thirteen such "failure to comply" situations and each time the vehicle was impounded. *Id.* Such a blanket policy appears to ignore the requirement that a warrantless seizure be justified by either probable cause or the community caretaking doctrine.

Accordingly, disputed issues of fact exist as to whether this procedure described by Ellingson is the Town of Newburgh's policy or custom, and summary judgment on Plaintiff's *Monell* claim against the Town of Newburgh is denied.

### G. Malicious Prosecution

Defendants seek summary judgment on both Plaintiffs' section 1983 claim for malicious prosecution against Karabales and Plaintiffs' state law claim for malicious prosecution against the Town of Newburgh.

"A claim for malicious prosecution under Section 1983 is substantially the same as a claim for malicious prosecution under New York law." *Almonte v. Rodriguez*, No. 15 Civ. 9762, 2017 WL 4011461, at *8 (S.D.N.Y. Sept. 11, 2017) (internal quotation marks omitted). To prevail on a state law malicious prosecution claim, a plaintiff must demonstrate "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice." *Swartz v. Insogna*, 704 F.3d 105, 111-12 (2d Cir. 2013). To prevail on his § 1983 malicious prosecution claim, the plaintiff must establish the elements of a malicious prosecution claim under state law and must

34

also demonstrate a post-arraignment deprivation of liberty sufficient to implicate his Fourth Amendment rights. *See id.* at 112.

"The existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotation marks and citation omitted). Unlike false arrest claims, however, "the defendant must have possessed probable cause as to each offense charged." *Berry v. Marchinkowski*, 137 F. Supp.3d 495, 536 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). Further, "the probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013). "The Second Circuit has clarified that 'probable cause' in the malicious prosecution context means 'probable cause to believe that [the prosecution] could succeed.'" *Garcia v. Cty. of Westchester*, No. 11 Civ. 7258, 2017 WL 6375791, at *23 (S.D.N.Y. Dec. 12, 2017) (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). Thus, "if the evidence giving rise to the prosecution 'would clearly not be admissible,' then 'there [is] no probable cause to believe [a] prosecution could [have] succeed[ed].'" *Vasquez v. Reilly*, No. 15 Civ. 9528 (KMK), 2017 WL 946306, at *8 (S.D.N.Y. Mar. 9, 2017) (quoting *Boyd*, 336 F.3d at 77).

Defendants concede that a criminal proceeding was commenced against Plaintiffs and that it terminated in Plaintiffs' favor. Defendants appear to challenge the remaining elements, of both the state law and section 1983 claims, but only directly address the probable cause element. Plaintiffs' requirement to attend criminal proceedings is sufficient to satisfy the section 1983 post-arraignment deprivation of liberty element. *See Swartz*, 704 F.3d at 112. As discussed *supra*, a jury could conclude that Plaintiffs did not fail to stop for Karabales, did not fail to stop at stop signs, either were not in possession of marijuana or that the marijuana was recovered in

an illegal search and, thus, that probable cause to believe a prosecution could succeed was lacking for the charges against Plaintiffs. Moreover, the "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997).

Accordingly, Defendants' motion for summary judgment on Plaintiffs' state and federal malicious prosecution claims is denied.

## 1. Qualified Immunity

As in the false arrest context, if an officer's "probable cause determination was objectively reasonable—that is, whe[n] there was 'arguable' probable cause to arrest," then the officer is entitled to qualified immunity for a malicious prosecution claim. *Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014). The various disputes of material fact, discussed above, preclude this Court from determining whether arguable probable cause to believe that the prosecution could succeed existed. Accordingly, Karabales is not entitled to qualified immunity on this claim.

## 2. Municipal Immunity

Defendants argue that they cannot be held liable for the state law malicious prosecution claim because Karabales' actions during the stop and arrests all involved discretionary functions. Dkt. 36-3 at 24 (citing *McLean v. City of New York*, 12 N.Y.3d 194, 202-03 (2009); *Johnson v. Town of Colonie*, 102 A.D.2d 925 (3rd Dept. 1984); *Hephzibah v. City of New York*, 124 A.D.3d 442 (1st Dept. 2015); *Alvarez v. Beltran*, 121 A.D.3d 488 (1st Dept. 2014)). Plaintiffs counter that "[m]unicipalities surrendered their common-law immunity for the misfeasance of their officers and employees long ago." Dkt. 39 at 24-25 (quoting *Tango v. Tulevich*, 61 N.Y.2d 34, 40 (1983)).

In *Tango*, the Court discussed both the immunity of state officers and municipal immunity. 61 N.Y.2d at 40-42. Defendants appear to conflate the two topics. The Court "focused more specifically on the immunity of state officers and has adhered to the notion that these individuals will be deemed immune if they exercised discretion rather [sic] performed ministerial acts." *Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735, *259 (S.D.N.Y 2011) (citing *Tango*, 61 N.Y.2d at 40-42). However, Plaintiffs are correct that, concerning municipal liability, "[m]unicipalities surrendered their common-law immunity for the misfeasance of their officers and employees long ago." *Tango*, 61 N.Y.2d at 40; *see also Haus*, 2011 U.S. Dist. LEXIS 155735, at *261.

Two of the cases cited by Defendants, *supra*, involve a claim that a city's negligence caused the plaintiff's injuries (*McLean*, 12 N.Y.3d at 199) and the issue of prosecutorial immunity (*Johnson*, 102 A.D.2d at 926). The remaining cases cited by Defendants involve the alleged negligence of police officers which resulted in the injuries of bystander plaintiffs. *See Hephzibah*, 124 A.D.3d 442; *Alvarez v. Beltran*, 121 A.D.3d 488. These cases are not in conflict with *Tango* and *Haus*. Moreover, Plaintiffs allege malicious prosecution based on a lack of probable cause and actual malice, not on discretionary acts such as contemplated in *Tango*. *See Haus*, 2011 U.S. Dist. LEXIS 155735, at *261-62.

Thus, as in *Tango*, "if plaintiffs prove that . . . the individual defendant[ ] committed torts while engaging in actions within the scope of [his] employment, then the [Town of Newburgh] may be held vicariously liable." *Id.*

Accordingly, Defendants' motion for summary judgment on Plaintiffs' state law malicious prosecution claim against the Town of Newburgh is denied.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs' federal equal protection claim against Karabales is dismissed. The following claims against the Town of Newburgh are dismissed: (1) unlawful stop, (2) unlawful search, (3) unlawful arrest, (4) excessive force, and (5) the state law equal protection claim. Defendants' motion for summary judgment is **DENIED** in all other respects.

Accordingly, the following claims remain for trial: (1) unlawful stop against Karabales, (2) unlawful search against Karabales, (3) unlawful arrest against Karabales, (4) excessive force against Karabales, (5) unlawful vehicle seizure against Karabales, (6) section 1983 malicious prosecution against Karabales, (7) the state law claim for malicious prosecution against the Town of Newburgh, and (8) the *Monell* claim against the Town of Newburgh.

The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. 36).

Counsel shall appear for a final pretrial conference on April 15, 2020, at 10:30 a.m. in Courtroom 420.

Dated: March 6, 2020
White Plains, New York

SO ORDERED

Paul E. Davison, U.S.M.J.